UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LAWRENCE E. DUNN,                           CIVIL NO. 04-1476 (JRT/JSM)

    Plaintiff,

v.                                          REPORT AND RECOMMENDATION

JO ANNE B. BARNHART,
Commissioner of Social Security,

    Defendant.

JANIE S. MAYERON, United States Magistrate Judge

## I.    INTRODUCTION

The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 13] and defendant's Motion for Summary Judgment [Docket No. 16].  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that plaintiff's Motion for Summary Judgment [Docket No. 13] be denied and defendant's Motion for Summary Judgment [Docket No. 16] be granted.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff applied for Disability Insurance Benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416, 423, on January 27, 2000.  (Tr. 99-101).  Plaintiff alleges a complete inability to work starting on October 31, 1986, due to migraine headaches.  Plaintiff's Mem., at p. 1 [Docket No. 14].  The period at issue in this case is between October 31, 1986, the

date of onset of the alleged disability and December 31, 1986,[1] plaintiff's date last insured for entitlement to Title II benefits.  (Tr. 20, 102).

The Social Security Administration denied plaintiff's application initially and upon reconsideration.  (Tr. 79, 86).  Plaintiff then filed a request for a hearing and on April 4, 2001 a hearing was held before Administrative Law Judge ("ALJ") Diane Townsend-Anderson.  (Tr. 26-74, 89).  On August 21, 2001, the ALJ issued a decision denying plaintiff benefits, finding that he had no past relevant work history, and that he was able to perform other jobs existing in significant numbers in the national economy.  (Tr. 21).  Plaintiff requested a review from the Appeals Council.  (Tr. 9).  On December 14, 2001, the Appeals Council denied his request, finding no basis for review under the regulations. (Tr. 6-7).

On August 21, 2002, the Honorable Susan R. Nelson, Magistrate Judge of this Court, granted a Joint Motion to Remand, "pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings[.]"[2] See Order, 02-CV-242 (PAM/SRN) (August, 21, 2002); Tr. 443.  The Appeals Council accordingly ordered a remand to the ALJ, finding that the "medical evidence produced after the date the claimant last met the disability insured status requirements . . . should have been evaluated to determine the extent to which such evidence may reflect upon the severity of the claimant's condition during the period at

---

[1]  The ALJ determined in her original decision of plaintiff's case that plaintiff's date last insured was December 31, 1986.  (Tr. 20).  On remand, the ALJ found that plaintiff's date last insured was June 30, 1987.  (Tr. 441).  No explanation is given for the change in date, and it appears that the ALJ's determination in this respect was error.  The Appeals Council explicitly stated that the date last insured was December 31, 1986, not June 30, 1987 as found by the ALJ.  (Tr. 415).  Plaintiff accepts December 31, 1986 as the date last insured, and the Court will as well.  See Plaintiff's Mem., at p. 1 (citing ALJ's Decision, dated August 27, 2001).

[2]  "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."

issue." (Tr. 445-46). The Appeals Council also noted that the Medical Expert at the hearing testified that plaintiff's complaints regarding the severity of his condition prior to the date last insured was consistent with medical records pertaining to the period following that date. (Tr. 446). The Appeals Council directed the ALJ to obtain supplemental testimony from a Medical Expert and a Vocational Expert. (Tr. 446).

On July 2, 2003, a hearing was held before ALJ Townsend-Anderson. (Tr. 513-46). On October 30, 2003 the ALJ issued her decision, again finding that plaintiff was not disabled because he was able to perform jobs existing in significant numbers in the national and regional economy. (Tr. 423-42). Plaintiff requested review from the Appeals Council. (Tr. 418-19). On February 3, 2004, the Appeals Council declined review, finding that the ALJ "thoroughly evaluated the evidence after the date last insured and considered the claimant's subjective complaints." (Tr. 415). Denial of review by the Appeals Council thus made the ALJ's decision the final decision of the Commissioner in this case. (Tr. 415). See 42 U.S.C. § 405(g).

Plaintiff sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g). [Docket No. 1]. The parties now appear before the Court on plaintiff's Motion for Summary Judgment [Docket No. 13] and defendant's Motion for Summary Judgment [Docket No. 16].

## III.   PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." 42 U.S.C. § 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992). The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by

reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least 12 months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

## A.   Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.909(a)(1), 416.1409(a). A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383 (c)(1); 20 C.F.R. §§ 404.929, 416.1429, 422.201 et seq. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process in Morse v. Shalala:

> The first step asks if the claimant is currently engaged in substantial gainful employment. If so, the claimant is not disabled. If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities. If not, the claimant is not disabled. If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is disabled. The fourth step asks if the claimant's impairments prevent [him] from doing past relevant work. If the claimant can perform past relevant work, [he] is not disabled. The fifth step involves the question of whether the claimant's impairments prevent [him] from doing other work. If so, the claimant is disabled.

16 F.3d 865, 871 (8th Cir. 1994).

### B.    Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-416.1492.  The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within 60 days after notice of the Appeals Council's action.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

### C.    Judicial Review

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and to consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exceptional and non-exertional activities and impairments.

5.    Any corroboration by third parties of plaintiff's impairments.

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1885 (8th Cir. 1989 (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g);

Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  "The substantial evidence test employed in reviewing administrative findings is more than a mere search of the record for evidence supporting the [Commissioner's] findings."   Gavin v. Heckler, 811 F.2d 1195, 1999 (8th Cir. 1987).  "'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing analysis." Id.  In reviewing the administrative decision, "'[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" Id. (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)).

In reviewing the record for substantial evidence, the Court may not substitute it's own judgment or findings of fact.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939.  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Gavin, 811 F.2d at 1199.

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once the claimant has

demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.  Martonik v. Heckler, 773 F.2d 236, 238 (8th Cir. 1985).

## IV.   DECISION UNDER REVIEW

### A.   The ALJ's Findings of Fact

Plaintiff was born on June 29, 1945, and was 41 years old at the time of alleged onset of disability.  (Tr. 99, 60).  Plaintiff graduated from high school and has two years of business college.  (Tr. 442).  Plaintiff has past relevant work experience as an accounting clerk.  (Tr. 442).  Plaintiff alleges that he became disabled starting October 31, 1986 due to migraine headaches.  (Tr. 427).

The ALJ concluded that plaintiff was not entitled to Disability Insurance Benefits under §§ 216(i) and 223 of the Social Security Act.  (Tr. 441-42).  The ALJ stated that she made the following findings based on the entire record:

1.   The claimant met the disability insured status requirements of the Act on October 31, 1986, the date the claimant stated he became unable to work, and he continued to meet them through June 30, 1987.[3]

2.   The claimant has not engaged in substantial gainful activity since October 31, 1986.

3.   The medical evidence establishes that during the period in question, from October 31, 1986 through June 30, 1987, the claimant suffered from recurrent migraine headaches, but that he did not have an impairment equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4.   The claimant's subjective complaints of disabling headache pain and the resulting degree of functional limitation for the period on and prior to his date last insured of June 30, 1987 is not fully credible.

---

[3]  See supra, note 1.

5.    During the period in question, from October 31, 1986 through June 30, 1987, the claimant retained the residual functional capacity to engage in a modified range of sedentary work activity, work primarily performed while sitting, and which involved occasional lifting of up to ten pounds, provided such sedentary work was of low stress, with minimal industrial standards for production and pace; involved no more than brief and superficial contact with co-workers, supervisors and the public; was performed in a quiet work environment with no exposure to strobe-type lighting, and provided such work did not involve working at heights, on ladders or scaffolds, or involve exposure to loud machinery.

6.    By reason of the claimant's residual functional capacity as set forth above, he can no longer perform his specific past relevant work as an accounting clerk.

7.    The claimant was 41 years of age at the time of his October 31, 1986 alleged onset date of disability, which is defined as being a "younger individual." The claimant has a twelfth grade education plus two years of business college, and his work history consists of employment as an accounting clerk.

8.    Unskilled and low level semi-skilled jobs within the claimant's residual functional capacity as it existed on and prior to June 30, 1987, existed in significant numbers in both the national and regional economy. The undersigned accepts the jobs cited in the areas of clerical sorter, security monitor, optical assembler, and accounting clerk, as examples of jobs the claimant was capable of performing on a full-time basis at all times on and prior to his date last insured of June 30, 1987, with these jobs all existing in significant numbers in both the national and regional economy.

9.    The claimant was not under a "disability," as defined in the Social Security Act, at any time on [or] prior to his date last insured on June 30, 1987.

(Tr. 441-42).

### B.    The ALJ's Application of the Five-Step Process

In reaching her findings, the ALJ made the following determinations under the five-step procedure. (Tr. 17-26). At the first step, the ALJ found that plaintiff had met the

earnings requirements during the relevant time frame.   (Tr. 15, 427); 20 C.F.R. § 404.1574(a).  At the second step, the ALJ found that plaintiff was subject to a severe impairment consisting of migraine headaches.   (Tr. 15); 20 C.F.R. §§ 404.1520(c), 404.1521.  At the third step, the ALJ determined that plaintiff's impairments did not meet, or medically equal, either singularly, or in combination, any listed impairments of the Listing of Impairments of Appendix 1, Subpart P, Regulations No. 4.[4]  (Tr. 15, 439).  At the fourth step, the ALJ found that plaintiff did not retain the residual functional capacity ("RFC") to perform his past relevant work.  (Tr. 440); 20 C.F.R. §§ 404.1545 and 404.1567.

Because the ALJ found that plaintiff did not retain the RFC to perform his past work, the ALJ proceeded to the fifth step of the sequential evaluation.  (Tr. 440).  The ALJ found that plaintiff retained the RFC to perform unskilled to low level semi-skilled sedentary work.  (Tr. 440).  Based on the testimony of the Vocational Expert ("VE"), the ALJ then found that numerous jobs exist in the national economy which an individual with plaintiff's limitations could perform.  (Tr. 440).  The ALJ thus found that plaintiff was not under a disability as defined in the Social Security Act at any time through the date of the decision.  (Tr. 441).

## V.   ISSUES UNDER REVIEW

On appeal, plaintiff contends the ALJ erred by: (1) improperly discounting plaintiff's subjective complaints of pain; (2) failing to incorporate all of plaintiff's limitations in the hypothetical question posed to the Vocational Expert; and (3) failing to question the Vocational Expert regarding the Selected Characteristics of Occupations.  See Plaintiff's Mem., p. 15, 22, 24; [Docket No. 14].  In his motion for summary judgment, plaintiff asks

---

[4]  The ALJ acknowledged that Dr. John LaBree, the Medical Expert on remand, testified that plaintiff's coronary artery disease has been severe enough to "at least equal the requirements of Section 4.04 of the 'Listings,' since 1999," and noted that plaintiff may be currently disabled due to the combination of his severe impairments and degree of functional limitation.  (Tr. 438-39).

9

this Court to reverse the final decision of the Commissioner of Social Security ("Commissioner") and award benefits, or in the alternative, to remand the matter back to the Commissioner for further proceedings consistent with proper legal principles. Id., at 25. In the cross-motion for summary judgment, the Commissioner asks this Court to deny plaintiff's motion for summary judgment and affirm the decision of the Commissioner denying plaintiff's claims for disability benefits. See Defendant's Mem., p. 14; [Docket No. 17].

### A.   The Medical Record

The Court notes, as an initial matter, that plaintiff bears the burden of proving he was under a disability, as defined in the Act, prior to his date last insured. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). Plaintiff's date last insured is December 31, 1986, and there is a dearth of medical evidence prior to this date, one treatment note to be precise. (Tr. 166). The ALJ initially found that plaintiff had not satisfied his burden of proving disability during the relevant period, but the matter was remanded with instructions to consider medical evidence following the date last insured. Accordingly, the Court has taken into consideration the medical evidence in the record which follows plaintiff's date last insured, to the extent that it is relevant and reflects upon plaintiff's condition prior to that date. See Pyland v. Apfel, 149 F.3d 873, 876-77 (8th Cir. 1998); Fowler v. Bowen, 866 F.2d 249 (8th Cir. 1989); Martonik, 773 F.2d at 240.

On December 29, 1986, plaintiff presented to the Family Medicine Clinic complaining of migraine headaches. (Tr. 166). Dr. Joel Esmay noted that plaintiff had

> [A] 15-year history of severe persistent migraine [headaches] with trials on numerous medications in the past. He does achieve partial control with Ergots and currently uses Y-grain

on a sparing basis.[5]  He also occasionally uses Percodan[6] although very rarely.  In the past he has been on a treatment program with Sansert[7] for several months . . . .  He is hesitant to reassume these because of the risks.  He has been considered for calcium channel blockers in the past but has not been tried on them.

(Tr. 166).  Dr. Esmay noted that plaintiff's headaches seemed to be sleep-related, although he had "numerous other trigger factors including chocolate, red wine, nuts and to a lesser degree alcohol."  (Tr. 166).  On observation, Dr. Esmay noted that plaintiff presented as a "[p]leasant male in no acute distress."  (Tr. 166).  A physical examination was normal  (Tr. 166).  Plaintiff was prescribed Percodan and Verapamil.[8]  (Tr. 166).

Plaintiff returned to Dr. Esmay on January 12, 1987, reporting "some improvement" in control of his headaches with Verapamil.  (Tr. 165).  Plaintiff indicated that he was taking it in the evening and morning, but that when he tried "taking it at mid-day he gets what he terms 'transitional head pain' which leads into a full vasscular [sic] [headache]."  (Tr. 165).

---

[5]  The term "Ergots" appears to refer to a medication derived from ergot, which is developed in rye plants and is the source of the ergot alkaloids.  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 49, 615 (29th Ed. 2000).

"Y-grain" appears to be the phonetic spelling of "Wigraine," and it is alternatively spelled by Dr. Esmay in the medical record as "Wygraine".  According to the U.S. National Library of Medicine and the National Institutes of Health, Wigraine is comprised of caffeine and ergotamine and is usually taken at the  first indication of a migraine headache.  See http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601048.html.

[6]  Percodan is the brand name for oxycodone, a semisynthetic opioid analgesic prescribed "for the relief of moderate to moderately severe pain."  PHYSICIAN'S DESK REFERENCE 1246 (58th Ed. 2004).  Percodan has actions qualitatively similar to that of morphine.  Id.  An "opioid analgesic" is a remedy that allegiates pain, and contains, or is derived from, opium, or is synthetic with opiate-like acitivites, but is not derived from opium.  Dorland's 71, 1271.

[7]  Sansert is the brand name for methysergide, a vascular headache prophylactic belonging to the group of ergot alkaloids, but not used once a headache has already started.  See http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a603022.html.

[8]  Verapamil hydrocholride is a calcium ion influx inhibitor and is indicated for the management of hypertension and angina.  PHYSICIAN'S DESK REFERENCE 3235-36.

Plaintiff reported that such a "transitional" headache was relieved by one Wygraine, but that when he took "Verapamil it will give him a full blown [headache] requiring Wygraines." (Tr. 165). Dr. Esmay noted that plaintiff was in no distress and assessed him with "Improving [headache] control." (Tr. 165).

On February 5, 1987, plaintiff complained of increasing migraine problems. (Tr. 165). Plaintiff reported having "had two fairly severe ones and one quite severe one '9 on a scale of 10.'" (Tr. 165). Plaintiff reported "that he gets sedation with the Verapamil and 'lack of motivation.'" (Tr. 165). Plaintiff wondered whether he would be a candidate for anti-depressants, noting that he had read about an experimental anti-depressant which blocks serotonin uptake. (Tr. 165). Plaintiff indicated that he had "quite thoroughly researched his HA's and feels that the really severe ones are related to serotonin release." (Tr. 165). Dr. Esmay observed that plaintiff was in good spirits with no obvious neurologic deficit. (Tr. 165).

On June 4, 1987, plaintiff returned to Dr. Esmay, reporting that his control had "slipped a bit recently." (Tr. 164). Plaintiff indicated that he had increasing problems with his daytime headaches requiring increasing use of Wygraine, and occasionally Percodan. (Tr. 164). Dr. Esmay observed that plaintiff was not in distress and that a physical examination was normal. (Tr. 164). On June 11, 1987, Dr. Esmay increased plaintiff's Amitriptyline[9] and his usage pattern of Wygraine. (Tr. 164). Dr. Esmay planned on obtaining a blood pressure profile over the next few weeks, and he placed plaintiff on a low salt diet. (Tr. 164).

---

[9] Amitriptyline is a tricyclic anti-depressant, sometimes used to treat chronic pain. <u>See</u> http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682388.html.

On July 22, 1987, plaintiff reported improvement in his headaches after tapering off of Elavil and going on a "small feeding high protein diet." (Tr. 163). Plaintiff reported "doing extensive reading on the possibility of hypoglycemia and feels this applies to him." (Tr. 163). Plaintiff reported three bad headaches in the previous couple of weeks, which were not relieved by Wygraine and required some Percodan. (Tr. 163). Dr. Esmay again noted that plaintiff was not in distress and presented with no obvious neurologic deficits. (Tr. 163).

Plaintiff was next seen at the Family Medicine Clinic on May 5, 1989. (Tr. 162). It was noted that he had "been followed by physicians, neurologist, myotherapists and read a large amount of literature in regards to treatment of his migraine [headaches]." (Tr. 162). It was noted that multiple regimes of calcium channel blockers, anti-depressants and other combinations of prophylactics had not been helpful. (Tr. 162).

On February 12, 1991, plaintiff underwent a cervical spine series and a computed tomography scan at the Noran Neurological Clinic. (Tr. 148-49). The cervical spine series revealed no abnormalities. (Tr. 148). The computed tomography study indicated acute sinusitis, but was otherwise unremarkable. (Tr. 149).

Plaintiff returned to the Family Medicine Clinic on February 11, 1992. (Tr. 161). It was noted that he had a long history of complex migraines, and that he had a "unique personality" and read lots of different literature, "[s]ome of it medical including grocery store publications but has been doing fairly well." (Tr. 161). It was noted that plaintiff had "a specialist he is seeing [who] treated his complex migraines and has several different types of headaches as has done well." (Tr. 161). On April 21, 1992, it was noted that plaintiff "as usual has some interesting information. He reads in the library on various modalities." (Tr. 159). It was also noted that plaintiff seemed to be having moderate migraines. (Tr. 159).

On April 24, 1992, plaintiff underwent an MRI of his lumbar spine, which revealed moderately advanced disc degeneration. (Tr. 150). Dr. Kurt Schellhas found that there was a small central disc herniation at L4-5, causing indentation of the thecal sac with mild flattening of the L5 nerve roots; minor facet joint asymmetry at L5-S1; and some foarminal spurring peripherally at L5-S1 on the right side, without neural compression. (Tr. 150).

On December 30, 1992, plaintiff was seen again at the Family Medicine Clinic, where it was noted that he had an "excellent result with . . . Stadol[10] from a [headache] standpoint, but had some adverse effects with a feeling of dissociation . . . ." (Tr. 157). Plaintiff reported that a very low dose was effective. (Tr. 157).

On March 8, 1993, plaintiff underwent an echocardiography for evaluation of chest pain and EKG changes. (Tr. 282). Dr. Paul Youngquist interpreted the results as a normal echocardiogram. (Tr. 282).

On October 29, 1993, plaintiff saw Dr. Esmay at the Mork Plaza Clinic for further evaluation of his chronic, recurrent migraine headaches. (Tr. 388). Dr. Esmay indicated that plaintiff had been tried on "virtually every category of antimigraine medication with marginal results." (Tr. 388). Plaintiff reported relief with sumatriptin.[11] (Tr. 388). Plaintiff indicated his belief that one of the major triggers for his headaches is in the presacral area, stating that he has to lie on his left side. (Tr. 388). Dr. Esmay noted that plaintiff had "done exhaustive reading around the subject of migraines and has found that some of the osteopathic explanations regarding the craniosacral system and dysfunction of this system

---

[10]   Stadol is the brand name for butorphanol, a narcotic analgesic. See http://www.nlm.nih.gov/medlineplus/druginfo/uspdi/202390.html#GXXg20239002.

[11]  Sumatriptin is used in the acute treatment of migraine headaches, and is sold under the brand name Imitrex. PHYSICIAN'S DESK REFERENCE 1528; (Tr. 387).

resulting in autogenic headaches seems to fit his pattern." (Tr. 388). Dr. Esmay noted that plaintiff was pleasant, alert, and in no obvious distress. (Tr. 388). Dr. Esmay scheduled an MRI. (Tr. 388). X-rays taken on October 29, 1993, revealed no abnormalities. (Tr. 391). An MRI of plaintiff's brain on November 9, 1993 was normal (Tr. 277).

On November 24, 1993, Dr. Esmay noted that plaintiff was having a bad day and that he had used one dose of Imitrex. (Tr. 387). Plaintiff indicated that he would be interested in a referral to a pain clinic. (Tr. 387). Dr. Esmay suggested that plaintiff see Dr. Randa. (Tr. 387). On January 12, 1994, Dr. Esmay noted that Dr. Randa had placed plaintiff on Depakote[12] and that plaintiff had some improvement. (Tr. 386). Dr. Esmay also referred plaintiff to Dr. Beehler. (Tr. 386). On observation, Dr. Esmay noted that plaintiff was pleasant and in no distress. (Tr. 386).

On February 14, 1994, plaintiff reported to Dr. Beehler that he felt his problems were in his lower back and that he wanted an evaluation and treatment. (Tr. 384). Dr. Beehler conducted an examination, noting no motor or sensory deficits. (Tr. 384). Dr. Beehler noted several areas of paravertebral tenderness. (Tr. 384). Dr. Beehler recommended osteopathic treatment, continued medications, and warm moist heat. (Tr. 384). On April 4, 1994, plaintiff returned to Dr. Beehler, complaining of increased pain. (Tr. 383-84). Dr. Beehler gave plaintiff treatment and again recommended continuing medication use and warm moist heat. (Tr. 383-84).

On June 9, 1994, plaintiff saw Dr. Esmay, reporting that he was obtaining relief with his medications. (Tr. 382). On June 23, 1994, plaintiff returned complaining of an acute exacerbation of low back pain. (Tr. 381). Dr. Esmay referred plaintiff to Dr. Webber.

---

[12] Depakote is used in the treatment of patients with complex partial seizures. PHYSICIAN'S DESK REFERENCE 431.

(Tr. 381). On September 26, 1994 Dr. Esmay refilled plaintiff's medications. (Tr. 380).

On March 9, 1995 plaintiff returned to Dr. Esmay reporting that he had been making progress and the Minnesota Pain Center with Dr. Samuel Yue. (Tr. 379, 414). Dr. Esmay noted some spasm and tenderness in plaintiff's cervical musculature. (Tr. 379). On March 22, 1995 plaintiff followed-up with Dr. Esmay for hypertension. (Tr. 378). Dr. Esmay noted his long history of chronic pain and mixed pattern headaches, but noted no other significant problems. (Tr. 378).

On December 5, 1995 plaintiff presented to Dr. Esmay for a follow-up regarding his chronic intractable headaches. (Tr. 376). Plaintiff reported he continued to experience almost daily headaches. (Tr. 376). Plaintiff reported that taking a single Sumatriptin tablet often controlled his headaches, but that at times he would have to take Wigraine and other medications. (Tr. 376). Dr. Esmay observed that a regimen of one Sumatriptin tablet a day would be reasonable. (Tr. 376).

On March 16, 1996 plaintiff reported that he had been reading a number of headache publications and felt that pituitary problems might underlie his symptoms. (Tr. 375). Dr. Esmay noted that an examination was unremarkable. (Tr. 375). On July 12, 1996, plaintiff indicated he was interested in a referral to a massage therapist and to the Fibromyalgia Clinic. (Tr. 373). Dr. Esmay approved the referrals and refilled his prescriptions. (Tr. 373). On October 1, 1996 plaintiff reported that chiropractic manipulations gave him temporary improvement for a few days, in that "his headaches and medication requirements go down." (Tr. 372). Dr. Esmay and plaintiff continued a similar treatment relationship through the end of 1997. (Tr. 366-71).

On February 11, 1998 Dr. Esmay noted that plaintiff had been diagnosed with fibromyalgia. (Tr. 365). On July 28, 1998 Dr. Esmay noted continued chronic problems

and refilled plaintiff's medications.  (Tr. 363).  On August 26, 1998 Dr. Esmay noted that plaintiff had coronary heart disease, and that he had been hospitalized from August 10 to August 13, 1998.  (Tr. 360-62).  On December 1, 1998, Dr. Esmay continued plaintiff's medications.  (Tr. 359).  On June 10, 1999 plaintiff followed up with Dr. Esmay after having hernia surgery.  (Tr. 351-52).  On September 1, 1999 plaintiff presented to Dr. Esmay complaining of exertional chest pain.  (Tr. 348-49).

On August 21, 2000 Dr. Alan Suddard, a state disability agency physician, completed a RFC assessment.  (Tr. 335-42).  Dr. Suddard noted plaintiff's date last insured as December 31, 1986.  (Tr. 335).  Dr. Suddard noted plaintiff's diagnosis of migraine headaches, and opined that plaintiff could lift 20 pounds occasionally and 10 pounds frequently, stand or walk about 6 hours in an 8-hour workday, and sit about six hours in an 8-hour workday.  (Tr. 336).

On September 14, 2000, Dr. Esmay completed a RFC questionnaire.  (Tr. 343-47).  Dr. Esmay diagnosed plaintiff with chronic mixed pattern headaches and fibromyalgia.  (Tr. 347).  With respect to the headaches, Dr. Esmay characterized them as severe multiple daily headaches with associated nausea and vomiting, mood changes and mental confusion/inability to concentrate.  (Tr. 347).  Dr. Esmay noted that plaintiff's headaches lasted from several hours to several days.  (Tr. 347).  Dr. Esmay reported that objective signs of plaintiff's headaches included tenderness, impaired sleep, impaired appetite and x-rays. (Tr. 346).  Dr. Esmay opined that plaintiff had a "[l]imited response to a wide range of interventions," he was not a malingerer, that he had a poor prognosis and that his headaches could be expected to last at least 12 months. (Tr. 345).  Dr. Esmay also opined that plaintiff would generally be precluded from performing even basic work when he had a headache and would need a break.  Id.  In this regard, Dr. Esmay stated that plaintiff

would need to take several 15 to 30 minute unscheduled breaks during an 8-hour workday, and that he would miss work more than four times per month.  (Tr. 344).  Dr. Esmay indicated that plaintiff could tolerated moderate stress, but that he had a limited tolerance for prolonged sitting, standing, lifting, bending, or exposure to fumes.  (Tr. 344).

On October 1, 2000, plaintiff followed up with Dr. Esmay who noted plaintiff's history of headaches and migraines along with chronic back pain.  (Tr. 482).  Dr. Esmay also noted some increasing problems with depression.  (Tr. 482).  Dr. Esmay observed that  plaintiff was in no apparent distress.  (Tr. 482).

At the April 4, 2001 hearing, Dr. Francis Goetz appeared as a neutral Medical Expert.  (Tr. 61-67).  Dr. Goetz stated that the record supported a "migraine disorder, 11.03, plus severe coronary heart disease, 4.03, 4.04."[13]  (Tr. 62).  Dr. Goetz went on to explain that in December of 1986, "the disease process in the heart was almost certainly on its way.  But had not yet, as I interpret the records, been disabling."  (Tr. 62).  With respect to plaintiff's headaches, Dr. Goetz testified that "migraines, which certainly are disabling in themselves if uncontrolled, [go] back in the documentation of the records available to me here, to before December 31st, '86."  (Tr. 62).  The ALJ asked Dr. Goetz whether plaintiff's migraines met or equaled any listings, to which Dr. Goetz replied that going back to 1987, he had "not been able to find any such evidence."  (Tr. 63).  Dr. Goetz testified that plaintiff's impairments did equal the listing level, as far as the coronary disease, as of 1997-1998, and that plaintiff's headaches equaled listing level severity when he was having them once a week, which did not happen until after plaintiff's date last

_____

[13]   Listing 11.03 is classified as "nonconvulsive epilepsy . . . documented by detailed description of a typical seizure pattern . . . occurring more frequently than once a month in spite of at least 3 months of prescribed treatment."  20 C.F.R. Part 404, Subpt. P, App. 1, § 11.03.  Listing 4.03 relates to hypertensive cardiovascular disease, and Listing 4.04 relates to ischemic heart disease.  Id., §§ 4.03, 4.04.

insured.  (Tr. 64-67).

Also on April 4, 2001, Dr. Yue wrote a letter "To Whom It May Concern" in which he stated:

> Mr. Lawrence Dunn suffered from male fibromyalgia with symptoms consisting of pain, muscle spasm, and fatigue.  He also suffered from many of the associated symptoms related to fibromyalgia, and male related endocrine disorder of low testosterone level.  These collected symptoms have disabled Mr. Dunn from any meaning line of work.  He is in my opinion completely disabled from any type of work.

(Tr. 414).

On December 19, 2002, Dr. Esmay wrote a letter "To Whom It May Concern" in which he stated that plaintiff had experienced migraine headaches since age 12, and had undergone multiple evaluations with limited benefit.  (Tr. 496).  Dr. Esmay indicated that he had a long treatment relationship with plaintiff and opined that plaintiff was "completely disabled from all work activities by chronic intractable headaches, complicated by severe fibromyalgia."  (Tr. 496).

At the July 2, 2003 hearing, Dr. John LaBree appeared as a neutral Medical Expert. (Tr. 530-40).  Dr. LaBree testified that starting December 29, 1986, the record indicated doctor visits for headaches in December of 1986, and January, February , June, and July of 1987, and May of 1989, but that plaintiff's headaches did not meet any listing.  (Tr. 530-32).  Dr. LaBree stated that "as of '99 . . . [plaintiff] would have met the listing under 4.04[.]"  (Tr. 531).  Dr. LaBree also noted that there were no objective findings in the record to establish a basis for plaintiff's subjective complaints of pain.  (Tr. 536-37). Dr. LaBree testified that plaintiff would be limited to a sedentary, low-stress job, limited contact with others, and a quiet environment without strong lights or strobe lighting. (Tr. 533).

**B.**     Plaintiff's Subjective Complaints of Disability

Failure to give some consideration to a claimant's subjective complaints is an error. Brand, 623 F.2d at 526. "[A] headache, back ache, or sprain may constitute a disabling impairment even though it may not be corroborated by an x-ray or some other objective finding."  Id.  An ALJ must consider a claimant's subjective complaints regardless of whether they are corroborated by objective medical findings.  Id.

In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984), *judgment vacated on other grounds sub nom.*, Bowen v. Polaski, 476 U.S. 1167 (1986).  The Polaski factors require the ALJ to give full consideration to all the evidence presented relating to subjective complaints, including prior work record, and observations of third parties and treating/examining physicians relating to such matters as:

1.     the claimant's daily activities;

2.     the duration, frequency, and intensity of the pain;

3.     precipitating and aggravating factors;

4.     dosage, effectiveness, and side effects of medication; and

5.     functional restrictions.

Id.

If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony."  Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).  "It is not enough that inconsistencies may be said to exist, the ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making credibility determinations."  Id.  "The

ALJ may discount a claimant's allegations of pain when he explicitly finds them inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996).  On the other hand, the ALJ may not disregard a claimant's subjective complaints solely because he or she believes the objective medical evidence does not support them.  Griffon v. Bowen, 856 F.2d 1150, 1154 (8th Cir. 1988).

At the April 4, 2001 hearing, plaintiff testified that he had worked as a financial manager during 1985 and 1986, but was let go because the owner's wife was taking over his duties and plaintiff was going to be assigned to a position where he was on his feet all the time.  (Tr. 33-34).  Plaintiff also testified that the owner "condemned me for buying light bulbs and a number of other things."  Id.  Plaintiff also indicated that the owner of the business was unsympathetic to his condition when he was experiencing a bad headache and so he left.  (Tr. 34).  Plaintiff testified that before the end of the year in 1986, he was experiencing about one headache a week.  (Tr. 36).  When a bad headache came on, plaintiff stated that he experienced "excruciating pain" and that he would "crawl on the floor and cry."  (Tr. 36-37).  Plaintiff also indicated that he vomited "all the time" and that such headaches would last for about 24 hours.  (Tr. 37).  Plaintiff testified that his headaches became much worse after 1986, and that in 1987 or 1988 they were occurring on a daily basis.  (Tr. 36, 38, 40).

When asked to describe his activities other than working, plaintiff testified that he gardened, he played volleyball one night a week, and managed an adult league men's softball team one night a week.  (Tr. 34-36).  Plaintiff stated that he lived with his parents, and that he cooked for them, drove them and took his mother grocery shopping. (Tr. 34-35).  His social activities were limited, but he did meet his future wife in 1985.  (Tr. 35).  In 1986, he rented an apartment with his future wife.  (Tr. 36).  In his Reconsideration

Disability Report dated July 6, 2000, plaintiff stated "brainfog limits clear thinking but may allow washing clothes, dishes or some simple tasks." (Tr. 138).

At the July 2, 2003 hearing, plaintiff testified that his condition had, if anything, gotten worse since the previous hearing, noting that he had been hospitalized several times due to his heart problems. (Tr. 516-17). Plaintiff testified that in the period of 1985 to 1986, he was having at least three headaches a week, although they were different kinds of headaches. (Tr. 523). Plaintiff did not indicate how many of one or the other he experienced, but he did state that they increased to five a week and that in the 1990s, he was experiencing them every day. (Tr. 524).

Plaintiff testified at the July 2003 hearing that he has never found any treatment of therapy which "really helped take care" of his headaches. (Tr. 526-27). Plaintiff stated that his major obstacle to employment, prior to December 31, 1986, was pain and an inability to leave his bed when he experienced pain due to his headaches. (Tr. 529). Plaintiff testified that on such occasions, he would be a "no show employee." (Tr. 529).

The ALJ analyzed plaintiff's subjective complaints under Polaski, finding plaintiff not entirely credible based on inconsistencies in the record as a whole. (Tr. 435, 438). The ALJ noted that, under the regulations, an impairment must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques, and found that there were no objective findings to establish a disabling impairment during the relevant period. 20 C.F.R. § 404.1508; (Tr. 436). The ALJ noted that Dr. LaBree had testified that there was no evidence to document disabling headaches on or prior to plaintiff's date last insured. (Tr. 436, 438). The ALJ then examined plaintiff's treatment history through 2003, noting

that there was "minimal evidence in the record of any functional limitations for the period prior to [plaintiff's] date last insured . . . ."  (Tr. 428-34, 437).

With respect to plaintiff's daily activities, the ALJ noted that plaintiff had engaged in a relatively broad range of daily activities, including gardening, light cooking, laundry, washing dishes, performing various household tasks, taking his mother shopping, playing volleyball once a week, and managing an adult softball team.  (Tr. 439).  The ALJ found that these activities during the relevant period, were not consistent with a disabling headache pain, and that at the time they were equal to or greater than the exertional demands for a modified range of sedentary work activity.  (Tr. 439).  The ALJ also noted that plaintiff had worked at a job that was stressful and skilled during the same 15-year period he claimed to have been experiencing disabling headaches.  (Tr. 437-438).

The ALJ acknowledged that Dr. Esmay and Dr. Yue had opined that plaintiff was completely disabled, but noted that such opinions were based on plaintiff's current impairments and that neither doctor had expressed the opinion that plaintiff was permanently disabled and unable to work because of severe headaches prior to December 31, 1986.  (Tr. 414, 438, 496). The ALJ also acknowledged that plaintiff did experience chronic headaches, but found that there was "simply no evidence in the record to indicate that these headaches occurred with such intensity or frequency so as to preclude all gainful activity."  (Tr. 438).

With respect to treatment, the ALJ found that plaintiff did not consistently seek or receive treatment for his headaches prior to December 31, 1986, noting that while plaintiff reported on December 29, 1986, a fifteen-year history of persistent migraine headaches, there were no records to document treatment for such headaches during this time period. (Tr. 438).

23

The ALJ found that plaintiff may very well be currently disabled, as of 1999, due to coronary artery disease, degenerative disc disease of the lumbar spine, and fibromyalgia, in addition to his history of chronic intractable headaches, but that his current medical condition could not be used as a basis to establish a disability on or prior to his date last insured.  (Tr. 438-39).

Based on these findings, the ALJ found that plaintiff retained the RFC to engage in a modified range of sedentary work, with the following restrictions: that plaintiff was able to lift and carry up to ten pounds occasionally and five pounds frequently, sit for a total of six out of eight hours, and stand or walk for a total of two out of eight hours; that plaintiff was limited to work performed in a low-stress environment, with no more than minimal industrial standards for production and pace; that plaintiff was limited to work involving no more than brief or superficial contact with co-workers, supervisors or the public; that plaintiff was limited to work performed in a quiet environment, with no exposure to strobe-type lights; and that plaintiff could not perform work at heights, on ladders or scaffold, or that involved exposure to loud machinery.  (Tr. 439-40).

Plaintiff contends that the ALJ improperly discredited his subjective complaints of disability arguing that his testimony as to daily activities does not detract from his claim and pointing to his testimony that he could not leave his bed when experiencing his headache pain.  Plaintiff also points out his testimony that he experienced headaches two or three times a week prior to his date last insured, and that he tried numerous therapies without avail.  Plaintiff argues that his subjective complaints are supported by the testimony of Dr. LaBree that the record reflected that plaintiff experienced migraine headaches 2-3 times a week, and the RFC evaluation completed by Dr. Esmay.  See Plaintiff's Mem., at pp. 16-22.

Defendant responded that the ALJ reasonably determined that plaintiff's complaints of debilitating headaches were not fully supported by the record.  In this regard, defendant pointed to the lack of medical records prior to December 31, 1986; that the only record prior to this date – dated December 29, 1986 – indicated that plaintiff was receiving partial control of his headaches from various medications; that treatment notes subsequent to plaintiff's date last insured revealed that he had obtained relief from medications; and that there were a number of notes indicating that he had been doing "well" or "fairly well".  See Defendant's Mem., pp. 9-10.  In addition, defendant argued that the ALJ had properly addressed various inconsistencies in the record, including plaintiff's ability to work during the 15-year period he claimed he had been experiencing debilitating headaches, that none of plaintiff's treating physicians had found that plaintiff was so limited that he could not perform sedentary work prior to the expiration of his insured status, and that plaintiff's daily activities during the relevant time period undermined his claim that he was completely disabled.  Id. at p. 10.  Defendant acknowledged that Dr. Esmay opined that plaintiff was "completely disabled", but points out that Dr. Esmay's treatment consisted mainly of refilling medications and referring plaintiff for other medical treatment.[14]

The question the ALJ must answer is not whether plaintiff experienced pain, but whether plaintiff's subjective complaints prevent him from performing any type of work. See McGinnis v. Chater, 74 F.3d 873, 874 (8th Cir. 1996).  It is the ALJ's duty to decide questions of fact, including the credibility of a claimant's testimony.  See Nelson v. Sullivan, 96 F.2d 363, 366 (8th Cir. 1992).  If the ALJ explicitly discredits the claimant's testimony and gives a reasoned analysis, it is proper to defer to the ALJ's determination.  See Russell

---

[14]    Defendant also argued that Dr. Esmay's opinion should be given little weight because he did not start treating plaintiff until almost 8 years after his insured status expired.  The record reflects that it was Dr. Esmay who saw plaintiff on December 29, 1986, and on several occasions after this date.  See e.g. Tr. 163-166, 381-382, 386-388.

v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991).  The question this Court must answer is not whether the record would have supported plaintiff's subjective complaints of total disability, but rather whether substantial evidence in the record as a whole supports the ALJ's determination.  See 42 U.S.C. § 405(g); Murphy, 953 F.2d at 384.

Thus, the central issue in this case is whether the record as a whole supports the ALJ's determination that plaintiff's subjective complaints of disabling pain between October 31, 1986 and December 31, 1986, were not entirely credible based on inconsistencies in the record.  After reviewing the entire record, this Court concludes that the ALJ's determination is supported by the record as a whole for the reasons below.

First, there are no documents in the record prior to December 29, 1986 to support plaintiff's claim that he had suffered from disabling headaches for 15 years.

Second, there is a paucity of medical records objectively documenting plaintiff's impairments and resulting functional limitations after December 31, 1986, the last date of insurability.  Rather, the records that follow after December 31, 1986, primarily document plaintiff's subjective complaints of headache pain.

Third, while the treatment notes in the years following plaintiff's date last insured reveal that he was experiencing headaches, there is very little as to the frequency or intensity.  Dr. Esmay noted on several occasions that plaintiff presented without distress and that his physical examinations were normal.  (Tr. 161-166, 388).  Only once, on November 24, 1993, did Dr. Esmay note that plaintiff was having a bad day, and that plaintiff had used one dose of Imitrex.  (Tr. 387).

Fourth, the medical record reflects positive results from medications, including Verapamil, Wigraine, Percodan, Stadol, Sumatriptin, and Depakote.  (Tr. 157,163, 165, 376, 386, 388).  It seems apparent that plaintiff did not like to take certain medications

because of their side effects, <u>e.g.</u>, the Verapamil, Percodan and Stadol, but it remains a fact that his contemporaneous reports to Dr. Esmay indicated that such medications were effective.  (Tr. 157, 163, 165, 376).  Plaintiff also indicated that chiropractic manipulations offered relief from his symptoms and medication usage.  (Tr. 373).

Fifth, plaintiff's daily activities, as he stated in the Reconsideration Disability Report and as he testified at the hearing on April 4, 2001, were inconsistent with his complaints of disabling pain.  While it is true that plaintiff does not need to be bedridden to qualify for disability benefits, plaintiff's ability during the relevant time period to engage in such activities as gardening, cooking, doing laundry and dishes, shopping, playing volleyball and managing an adult softball team are not consistent with a claim that he cannot perform even sedentary work.  <u>See</u> <u>Haley v. Massanari</u>, 258 F. 3d 742, 748 (8th Cir. 2001) (finding inconsistencies between subjective complaints of pain and daily living patterns where claimant could care for personal needs, wash dishes, change sheets, vacuum, wash cars, shop, cook, pay bills, drive, attend church, watch television, listen to the radio, visit friends and relatives, read and work on the construction of his home); <u>Haggard v. Apfel</u>, 175 F.3d 591, 594 (8th Cir. 1999) (finding that claimant's ability to cook some meals, water the flowers around his house, help his wife paint, watch television, go out for dinner, occasionally drive an automobile, and occasionally visit with friends, did not support a finding of total disability).  Further, plaintiff, by his own testimony, and as reported in numerous treatment notes, read copious amounts of material, at least 20 to 30 books worth of material, related to the underlying cause and treatment of his headaches.  <u>See e.g.</u> Tr. 161, 163, 165, 528.  The ability to read and retain such a large volume of information is inconsistent with an individual experiencing disabling symptoms.

Sixth, within the same time period that plaintiff claimed he was suffering from immobilizing headaches, he worked for a period of 17 months from June 1985 through October 31, 1986, as a financial manager for a company that molded rubber parts for old cars. (Tr. 128). Plaintiff worked part-time for approximately 6 months and then full-time for approximately 11 months. (Tr. 33). He left because the owner's wife was going to take over his job and because the owner "condemned [plaintiff] for buying light bulbs and a number of other things." (Tr. 33-34). Plaintiff's claim that he suffered from disabling headaches is belied by the fact that he was working within this same time period.

Finally, no doctor ever opined that plaintiff was completely unable to perform any work during the relevant time period of October 31, 1986 through December 31, 1986. To the extent that Dr. Esmay in 2000 placed limitations on plaintiff's ability to function, and both Drs. Esmay and Yue submitted letters in 2001 and 2002 indicating that plaintiff was completely disabled from working, no doctor addressed plaintiff's functionality or ability to work for the time period at issue in this case. See Tr. 343-47, 414, 496),

Accordingly, based on the record before it, the Court cannot say that the ALJ erred in finding plaintiff's subjective complaints less than credible. Mitchell, 25 F.3d at 714; see also Woolf, 3 F.3d at 1213. The ALJ is tasked with evaluating the evidence and making credibility determinations, and in this matter, the ALJ was presented with a limited record and primarily only plaintiff's subjective complaints to support a finding of disability. This Court may not substitute its own judgment or findings of fact on matters that are the province of the ALJ, and the central issue in this case is the credibility of plaintiff, most certainly a matter within the province of the ALJ. Id., 3 F.3d at 1213. The ALJ properly assessed plaintiff's subjective complaints according to the dictates of Polaski and expressly discounted aspects of plaintiff's testimony. As such, the Court finds that substantial

evidence in the record as a whole supports the ALJ's reasoned analysis and determination that plaintiff retained an RFC allowing for gainful employment.

### C.   The Questions Posed to the VE

"Testimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence."  Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).  While a hypothetical must accurately set forth all of the claimant's impairments, the question need only include those limitations accepted by the ALJ as true.  Rappaport v. Sullivan, 942 F.2d 1320, 1323 (8th Cir. 1991).

Steven D. Bosch, the VE, testified at the July 2, 2003 hearing.  (Tr. 540-42).  Based on the opinion of the Dr. LaBree, the ALJ asked VE to:

> [a]ssume we have an individual who's 31 years of age at the time . . . who has a twelfth grade education, work experience as outlined by yourself, who was on a number of medications with no reported side effects, who was impaired with migraines and suffered chronic pain as a result, who was limited to lifting and carrying 10 pounds occasionally, 5 pounds frequently, who could do work in a low stress environment, minimum industrial standards for production and pace are applicable, having only brief and superficial contact with others, an environments where there would be no bright strobing lights, or significant ambient noise, preferably a quiet environment where one is working either alone or with few other people.  And there's certainly [no] loud machinery noises of any kind.  And who could do work where there'd be no heights, ladders, scaffolding, dangerous or hazardous equipment and machinery.

(Tr. 540-41).  In response to the ALJ's question whether such a hypothetical individual could perform plaintiff's past relevant work experience, the VE testified in the negative. (Tr. 541).  The ALJ then asked the VE whether such a hypothetical individual could perform other work.  (Tr. 541).  The VE testified that such an individual could perform other sedentary unskilled work, such as clerical sorting, security monitor, optical assembler, and

other semi-skilled work such as accounting clerk.  (Tr. 541).  The ALJ asked the VE whether there was any discrepancy between his testimony and the Dictionary of Occupational Titles ("DOT"), to which the VE responded, "No."  (Tr. 541-42).

Plaintiff's counsel asked the VE whether a hypothetical individual with the additional limitations of not being able to function two to five days a week would preclude employment.  (Tr. 542).  The VE testified that such absenteeism would preclude employment. (Tr. 542). Plaintiff's counsel also questioned whether unpredictable half-hour to 45-minute breaks would preclude employment, to which the VE testified in the affirmative.  (Tr. 542).

Plaintiff contends that the ALJ failed to include all of plaintiff's impairments in the hypothetical question posed to the VE, and therefore the ALJ's finding that plaintiff retains the RFC to perform modified sedentary work is not supported by substantial evidence. Relying on his contention that the ALJ improperly discounted her subjective complaints of disability, plaintiff argues that the ALJ adopted the VE's testimony based on a hypothetical which failed to take into account plaintiff's inability to consistently show up for work, and the possibility that plaintiff might need to take unscheduled breaks or leave work unexpectedly.

As explained above, the ALJ engaged in a proper evaluation of the medical evidence and of plaintiff's credibility, and the Court finds plaintiff's contention to be without merit.  The ALJ formulated a proper RFC, based on substantial medical evidence and taking into account plaintiff's subjective complaints, and presented it in a proper form to the VE.  The ALJ was within his purview to reject any proposed additional limitation.  Rappaport, 942 F.2d at 1323.  A review of this matter shows that the ultimate finding of the ALJ, that plaintiff is not disabled because she retains the RFC to perform a significant number of

additional jobs, is supported by substantial evidence on the record as a whole.  See Wilson, 886 F.2d at 175.

Plaintiff also contends that the ALJ erred by failing to question the VE on whether there was a discrepancy between the VE's testimony and the Selected Characteristics of Occupations ("SCO").  Plaintiff's argument is without merit.  Plaintiff points to no substantive error, and cites to no authority that states an ALJ must question the VE a to whether a discrepancy exists under both the DOT and the SCO.  Social Security Ruling 00-4p, which makes clear that the SCO is a companion publication to the DOT and explicitly states that the "evidence provided by a VE . . . should be consistent with the occupational information supplied by the DOT."  SSR 00-4p.  If there is a conflict between the DOT and the VE's evidence, the ALJ "must elicit a reasonable explanation for the conflict before relying on the VE . . . ."  Id.  In this matter, the ALJ asked the VE whether there was any discrepancy between his testimony and the DOT, to which the VE responded, "No." (Tr. 541-42).  Plaintiff did not identify a conflict at the time of the hearing, and similarly fails to do so now.

## VI.    RECOMMENDATION

For the reasons set forth above, this Court finds that the decision by the ALJ to deny plaintiff disability benefits is supported by substantial evidence on the record as a whole.

Therefore, it is recommended that:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 13] be **DENIED**; and

2.    Defendant's Motion for Summary Judgment [Docket No. 16] be **GRANTED**.

Dated:    February 17, 2005

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties on or before March 4, 2005 a copy of this Report, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.